# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 16-1707

ROBERT W. MOODY, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided November 8, 2018)

*Todd M. Wesche*, now of Salt Lake City, Utah, and Kenneth M. Carpenter, of Topeka, Kansas, were on the briefs for the appellant.

*Meghan Flanz,* Interim General Counsel; *Mary Ann Flynn*, Chief Counsel; *Selket N. Cottle*, Deputy Chief Counsel; and *Ashley D. Varga*, all of Washington, D.C., were on the brief for the appellee.

Before SCHOELEN, PIETSCH, and TOTH, *Judges*.

PER CURIAM. PIETSCH, *Judge*, filed an opinion concurring in part and dissenting in part. TOTH, *Judge*, filed an opinion concurring in part and dissenting in part.

PER CURIAM: Veteran Robert W. Moody appeals a January 2016 Board decision that denied a disability rating higher than 40% for a thoracolumbar spine disability, disability ratings higher than 10% for right and left leg neurological impairments, and service connection for an acquired psychiatric disorder; and concluded that it could not adjudicate entitlement to a total disability rating based on individual unemployability (TDIU) under 38 C.F.R. § 4.16(a), what we shall refer to as schedular TDIU.

The Board remanded for the Director of VA's Compensation Service to determine entitlement to TDIU under § 4.16(b), what we'll refer to as extraschedular TDIU. The Court does not have jurisdiction over that issue and may not review it at this time. *See Breeden v. Principi*, 17 Vet.App. 475, 478 (2004).

Under § 4.16(a), the Board may award schedular TDIU in the first instance when a veteran meets specified rating criteria, such as having a single service-connected disability rated 60% or higher. This regulation also provides that certain kinds of disabilities—for example, those

originating from the same event—"will be considered as one disability." 38 C.F.R. § 4.16(a) (2018). The issue here is whether the quoted language directs the method by which multiple disability ratings are aggregated to determine whether a claimant exceeds the 60% threshold necessary to claim schedular TDIU.

We conclude that § 4.16(a) unambiguously requires VA to use its combined ratings table when aggregating disabilities for the purpose of considering them "as one disability" and that the Board, therefore, correctly concluded that it could not consider schedular TDIU at that time. For the reasons below, however, we vacate that portion of the Board decision, as well as the portions pertaining to the psychiatric, sciatic nerve, and spine claims, and remand for additional proceedings consistent with this opinion.

## I. BACKGROUND

Mr. Moody served in the Marine Corps from February 1973 to June 1974. R. at 397. He first sought disability compensation around 2007 for various disabilities that all stemmed from an in-service assault. During service, he was diagnosed with inadequate-type personality and an "immature personality, severe, manifested by impulsive judgment and immature decision making and extreme explosive behavior." R. at 19, 1659. At a 2010 VA psychiatric evaluation, he reported anger, anxiety, difficulty sleeping, and problems "getting along with people." R. at 1656. The examiner diagnosed intermittent explosive disorder and personality disorder. R. at 1658-59. The examiner concluded that the appellant had a personality disorder prior to his active service and that his "current diagnosis is a continuation of his psychiatric condition noted in service." R. at 1659.

Mr. Moody also underwent a February 2011 VA back examination and that examiner diagnosed intervertebral disc syndrome with thoracolumbar degenerative arthritis and sciatic nerve impairment in both legs, all of which were as likely as not related to military service. R. at 1183. Thoracolumbar spine range of motion was limited to between 25 and 30 degrees in all planes and not further limited following repetitive motion.[1] R. at 1181. Normal function was not impaired by

---

[1] With respect to range of motion for the thoracolumbar spine, VA considers normal forward flexion to 90 degrees and extension, left and right lateral flexion, and left and right rotation to 30 degrees. *See* 38 C.F.R. § 4.71a, Plate V (2018).

pain, fatigue, weakness, or other problems. *Id*. Daily activities—such as walking, standing, eating, and dressing—were unaffected. *Id*.

The VA regional office (RO) granted service connection for the back disability with an assigned 40% rating, as well as two 10% ratings for sciatic nerve impairment in both legs. R. at 1048-52. But service connection for a mental disorder was denied. R. at 1223-30. Mr. Moody retained an attorney and initiated an appeal as to the ratings assigned and the denial of service connection. Around this time, he applied for TDIU, asserting that service-connected disabilities rendered him unemployable. R. at 923-24. The RO denied TDIU the following year. R. at 561-65.

In March 2012, a medical examiner opined that "it is less likely than not that [Mr. Moody's] Intermittent Explosive [Disorder] was aggravated beyond its natural progression during service." R. at 998-1000. In an April 2012 Statement of the Case, the RO continued its decision to deny the psychiatric disorder claim. R. at 972-93. At about that time or soon after, his care providers diagnosed him with depression. R. at 461, 463, 602-03, 644.

In support of his TDIU claim, Mr. Moody submitted an October 2013 report from a vocational rehabilitation consultant opining that, because of the permanency and persistence of Mr. Moody's service-connected back and nerve impairments, he was unemployable. R. at 17. In support of this opinion, the vocational consultant concluded that Mr. Moody lacked the functional capacity to perform a full range of sedentary employment. *Id*.

While his appeals were pending, Mr. Moody underwent a January 2015 VA peripheral nerves examination. In his legs, he reported severe pain, moderate tingling or burning, and mild numbness. R. at 348. Physical evaluation revealed normal muscle strength, muscle tone, tendon reflex, gait, and sensation save for some decreased feeling in the feet. R. at 348-50. The examiner diagnosed mild incomplete paralysis of the sciatic nerve in both legs and remarked that these conditions did not require the use of any assistive devices or affect the ability to work. R. at 353-57.

Less than six months later, in July 2015, Mr. Moody testified at a Board hearing. R. at 288-307. A few days later, his then-attorney submitted a brief. R. at 274-78. With respect to the back, the following colloquy occurred:

> ATTORNEY: Your back condition is rated at 40 percent and that rating I believe dates back to 2007. Would you say that your back condition has gotten better, stayed the same or has gotten worse?
> VETERAN: It's gotten worse.

ATTORNEY: And why do you say that, sir?

VETERAN: Because it's like in 2007 when I was given that rating, I didn't have the (inaudible), didn't have that much trouble falling asleep because of the pain. I would actually ride my bicycle without pain. And now it takes a gross effort to get out of bed. I can no longer ride my bicycle and I can't play with my dogs. Standing for a period of time gives me severe pain. Sitting for a length of time gives me severe pain.

ATTORNEY: Do you have—would you say that your range of motion has become more limited? I mean, you and I talked about this and you said that sometimes you have to be careful of the way you turn because you get the sharp pains in your back now.

VETERAN: That's correct. I have to be careful of my movement because of the pain because if I move the wrong way it will aggravate it and make it worse.

R. at 291-92. Mr. Moody also averred that he could touch his toes but would experience back pain when he stood up. R. at 293. Later in the hearing, the Board member addressed the back claim:

BOARD MEMBER: You know, I understand what you're saying, it does have to be confirmed by some medical evidence at least the two things together. With your back, you know, you're at 40 percent which is really for pretty limited motion, it's for forward flexion of the lumbar spine 30 degrees or less, okay. Or favorable ankylosis of the entire thoracic lumbar spine and ankylosis is kind of a—the joint, you're—basically your back is kind of stuck in a kind of position. So the next higher rating 50 percent is unfavorable ankylosis. That's your spine is locked in a bad position and you really can't move, you know, you're talking about hard moving side to side but it would be like you're stuck to the left or you're stuck to the right or something. And you don't have that indeed, you know, you're testing that while it's painful and difficult for you, you're bending down to pet your dog. You're doing some things.

ATTORNEY: Right.

BOARD MEMBER: So, you know, I mean, on that basis even though your pain and your symptoms might be increasing, that's encompassed by—there's a certain range of what your 40 percent covers.

R. at 295.

Turning to sciatic nerve impairment in both legs, Mr. Moody testified that those conditions were worse, characterized by severe pain, especially at night, and increased numbness; his attorney requested a new examination. R. at 293. Finally, the veteran alleged that his depression is linked to his severe back and leg pain because it interfered with his sleep and other "normal functions." R. at 303-05.

Following the hearing, Mr. Moody's attorney submitted a brief to the Board that included the following statements. First, that "Mr. Moody has not been examined for rating purposes for

4

this [spine] condition since February 23, 2011." R. at 276. Second, regarding sciatic nerve impairment in each leg, that "Mr. Moody was most recently examined for rating purposes for this condition on February 23, 2011. He will testify that since that date this condition has continued to worsen." *Id*.

In the January 2016 decision on appeal, the Board denied service connection for a psychiatric disorder. The Board concluded that during service the only mental disorder that Mr. Moody had was a personality disorder, which is not considered a disease or injury under the laws governing VA benefits. R. at 21. The Board recognized that service connection may be granted for a disability resulting from a mental disorder that is superimposed on a personality disorder; however, the Board concluded that there was no medical evidence in the record stating that Mr. Moody's depression or any other psychiatric illness was superimposed on his personality disorder. R. at 21-22. Finally, the Board concluded that there was no competent medical evidence that the appellant had a mental disorder that was secondary to his service-connected disorders. R. at 22. The Board also denied higher ratings for bilateral sciatic nerve impairment and the thoracolumbar spine disability. As discussed below, the Board concluded that it was not necessary to obtain new VA examinations before deciding these claims. R. at 23-25.

Additionally, the Board denied TDIU on a schedular basis under § 4.16(a). The Board determined that, since Mr. Moody's compensable disabilities shared a common origin, they should be deemed a single disability for TDIU purposes. However, it further ruled that, applying VA's combined ratings table, the overall evaluation for these conditions would total only 50%, short of the 60% requirement for TDIU. The Board rejected the veteran's argument that the overall combined rating should be determined by simply adding 40%, 10%, and 10% ratings as if they were whole numbers. R. at 15-17. This appeal followed.

After briefing was completed, Mr. Moody filed an opposed motion for oral argument. Before ruling on this motion, however, the Court stayed proceedings pending the Federal Circuit's decision in *Gazelle* and ordered the parties to file memoranda of law when that decision issued addressing how it would affect their positions. The Federal Circuit issued a decision last year, *Gazelle v. Shulkin (Gazelle II)*, 868 F.3d 1006 (Fed. Cir. 2017), *aff'g Gazelle v. McDonald (Gazelle I)*, 27 Vet.App. 461, 468 (2016), and the parties filed the requested memoranda. As for the veteran's motion, we find the parties' filings and the *Gazelle* decisions adequate to decide this case and so will deny the request for oral argument. *Cf*. U.S. VET. APP. R. 34(b).

5

## II. ANALYSIS

### A. Schedular TDIU

TDIU may be assigned where a veteran is "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a). The Board may award TDIU in the first instance when an unemployable veteran is in receipt of disability compensation that, although less than total, meets certain schedular requirements. *See Cantrell v. Shulkin*, 28 Vet.App. 382, 387 (2017). If the veteran has only one service-connected disability, it must be rated 60% or higher; if the veteran has multiple service-connected disabilities, at least one must be rated 40% or higher and there must be "sufficient additional disability to bring the combined rating" to 70% or higher. 38 C.F.R. § 4.16(a). The regulation then specifies five circumstances in which multiple disabilities "will be considered as one disability"—the second circumstance, implicated here, is where the disabilities result from "common etiology or a single accident." *Id.*

There is no dispute either that Mr. Moody's compensable disability evaluations stem from the same in-service incident or that these disabilities are to be aggregated for TDIU purposes. The parties also agree that the regulatory language is plain; they disagree, however, on the aggregation method required by this plain language. The veteran contends that, when § 4.16(a) says certain service-connected disabilities "will be considered as one disability" for schedular TDIU purposes, this unambiguously means that the respective disability ratings should simply be added. In his case, that would mean that his 40% rating and two 10% ratings would aggregate to 60%, thereby meeting the requirement under § 4.16(a) that allows the Board to award schedular TDIU without first referring the issue to the Compensation Service Director. The Secretary disagrees. He argues that the clear meaning of the quoted § 4.16(a) language instructs VA to combine service-connected disability ratings using the combined ratings table, which results in Mr. Moody's etiologically related disabilities being rated 50% disabling.

At this point, a little information about the combined ratings table is helpful. The various disability evaluations assigned in VA's rating schedule represent "the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations." 38 C.F.R. § 4.1 (2018). The combined rating table provides that, after individual conditions are "separately" rated, the disabilities are then all combined "as described in paragraph (a)." 38 C.F.R. § 4.25(b) (2018). VA first considers the most disabling condition—that is, the one

with the highest rating—then less disabling conditions "in order of severity" according to the formula set out in the table. *Id.* The purpose of the table is to capture accurately the residual occupational "efficiency" of a veteran disabled by more than one condition. *Gazelle I*, 27 Vet.App. at 468. This method of combination also avoids the impermissible award of an aggregate disability rating greater than 100%, which might result from just adding multiple ratings, and represents more accurately a veteran's true disability level. *Id.* at 468 & n.9. With general understanding of the combined ratings table, we turn to the language of § 4.16(a).

Interpretation of a regulation is a legal question that the Court reviews de novo. *Miller v. Shulkin*, 28 Vet.App. 376, 380 (2017). Our analysis starts with the text. To properly construe a regulatory provision and ascertain its plain meaning, we consider the specific language at issue and how it fits into the overall regulatory scheme. *McCarroll v. McDonald*, 28 Vet.App. 267, 271 (2016) (en banc). This entails examining statutes and regulations in effect at the time the relevant provision was enacted. *See Gazelle II*, 868 F.3d at 1011.

Absent an express definition, it is presumed that VA regulations employ words using their ordinary dictionary meanings at the time the regulations were promulgated. *See Nielson v. Shinseki*, 607 F.3d 802, 805-06 (Fed. Cir. 2010). The regulatory language at issue—"will be considered as one disability"—first appeared verbatim in regulations issued by VA in 1941 and remained unchanged during the 1964 codification of title 38 of the Code of Federal Regulations.[2] *See* The Schedule for Rating Disabilities, 1933 Edition, Extension No. 4(I)(2)(a) (promulgated Nov. 14, 1941); 29 Fed. Reg. 6718, 6719 (May 22, 1964).

However, as might have been predicted, consulting dictionary definitions of "consider" from this time period does not settle the issue. Among the myriad meanings, the most relevant are to "estimate; calculate" and to "view as in a certain relation; . . . regard; . . . judge." WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 568 (2d ed. 1934); *accord* WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 483 (3d ed. 1961) ("to think of: come to view, judge, or classify"). Citing these definitions of "consider," Mr. Moody proposes that the phrase "will be considered as one disability" means that etiologically related disabilities should "be viewed together as a single whole and not as individual parts." Appellant's Br. at 14. Yet even if we accept that "consider" here means "viewed together as a single whole,"

---

[2] At the time, the agency was known as the Veterans Administration. It was renamed the Department of Veterans Affairs in 1988. The abbreviation "VA" is used interchangeably throughout.

this meaning offers no help in answering precisely *how* to view these disabilities as a whole. The language of the regulation does not identify the method by which disabilities are to be combined or aggregated into "one disability." Considering § 4.16(a)'s language in isolation does not answer this question.

Looking to the overall regulatory scheme to determine meaning here, we find helpful guidance in the Federal Circuit's *Gazelle II* decision.[3] At issue in that case was the meaning of the phrase "service-connected disability or disabilities independently ratable at 60 percent or more" in 38 U.S.C. § 1114(s), VA's special monthly compensation (SMC) statute. There, as here, the appellant argued that disability ratings should simply be added to determine whether the 60% threshold was reached, whereas the Secretary argued that the combined ratings table must be employed. Concluding that the quoted language did not "identify the method" by which VA was to "rate multiple disabilities," the Federal Circuit reviewed the state of veterans law when Congress enacted the relevant SMC provision in 1960.[4] *Gazelle II*, 868 F.3d at 1011.

This review showed that, "at the time the statute was enacted, VA's only method of rating multiple disabilities was to combine the ratings using the combined ratings table." *Id*. Because Congress was presumed to be aware of the exclusive role of the combined ratings table at the time it enacted the SMC statute, the language it used in section 1114(s) "unambiguously" indicated that method for the combination of disabilities. *See id.* at 1011-12; *accord Gazelle I*, 27 Vet.App. at 470 ("This is the method VA uses today, and, importantly, it was the method in place . . . when Congress consolidated the veterans benefits law in title 38.").

A similar analysis here leads to the same conclusion. As already noted, the phrase "will be considered as one disability" initially appeared in a 1941 promulgation from VA and has remained unaltered through the current version of § 4.16(a). Yet, the combined ratings table has an even earlier origin. In 1917, Congress instructed VA to set up a schedule for evaluating reductions in earning capacity resulting from "injuries or combinations of injuries," and the agency responded with the first combined ratings table in 1925. *Gazelle II*, 868 F.3d at 1011. Since then, a combined ratings table has been continuously reauthorized by Congress and employed by VA to aggregate multiple service-connected disabilities. *See id.* at 1011-12 (tracing this history); 29 Fed. Reg. at

---

[3] The Federal Circuit's reasoning tracked the analysis of this Court in *Gazelle I*.

[4] In 1960, the SMC statute was codified at 38 U.S.C. § 314.

6719. Thus, in the regulatory context in which VA first used the phrase "will be considered as one disability," the combined ratings table was plainly and unambiguously the only method for combining disabilities to determine whether they qualified as one 60% or one 40% disability for schedular TDIU purposes.

Mr. Moody offers two main arguments challenging this conclusion. First, he contends that *Gazelle* does not apply because that decision "turned on the clear and unambiguous language of a statute as opposed to a regulation." This is a distinction without a difference. The Federal Circuit's reasoning—that the plain meaning of text could be determined because Congress was presumably cognizant of VA's combined ratings table and enacted section 1114(s) with knowledge of that existing regulatory provision—applies with even greater force when analyzing the meaning of the regulation at issue here. "The canons of construction of course apply equally to any legal text and not merely to statutes." *Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994). And the presumption that Congress legislates "against the backdrop of existing law" is such a canon. *Morgan v. Principi*, 327 F.3d 1357, 1361 (Fed. Cir. 2003). Given the combined ratings table's long-standing application in veterans law and the presumption that Congress was aware of it when enacting the SMC statute, we see no reason not to presume that VA was likewise aware of it when it promulgated the TDIU rule.[5]

Second, Mr. Moody asserts that the combined ratings table is only relevant to aggregating service-connected disabilities when calculating the actual amount of compensation to pay. Because no compensation is paid as a direct result of the aggregation taking place in § 4.16(a), he argues, the combined ratings table has no role in determining how multiple disabilities "will be considered as one disability." We disagree.

"VA's *only method of rating* multiple disabilities [is] to combine the ratings using the combined ratings table." *Gazelle II*, 868 F.3d at 1011 (emphasis added). Although this method might be employed most often when calculating the amount of disability compensation to pay, there is no principled reason to confine its application only to that context. The object of the combined ratings table is to assess accurately the *overall* residual efficiency of a veteran afflicted

---

[5] There may be good reasons not to extend this presumption too far, *see, e.g.*, *Caring Hearts Pers. Home Servs. v. Burwell*, 824 F.3d 968, 976 (10th Cir. 2016) (Gorsuch, J.) ("This case has taken us to a strange world where the government itself — the very 'expert' agency responsible for promulgating the 'law' no less—seems unable to keep pace with its own frenetic lawmaking."), but the long-standing notoriety of a rule like the combined ratings table moots any such concern in this case.

by multiple service-connected disabilities. The 40% rating assigned for Mr. Moody's back condition was based on the presumption that he still had residual earning capacity. *See, e.g.*, *Guerra v. Shinseki*, 642 F.3d 1046, 1047 (Fed. Cir. 2011) ("A veteran rated at 10% has, on average, 90% of the earning capacity of a nondisabled individual . . . ."). But so too were the 10% ratings assigned for sciatic nerve impairment.

Which gets to the crucial point about combined ratings: They are meant to capture the dynamic where additional disabilities accrue in a person already functioning at less than 100% earning capacity.[6] In such circumstances, the sum is not simply the combination of each isolated part, as if those parts presented themselves alone in a person of otherwise optimal ability. Rather, each additional disability further limits the earning capacity of a person already functioning at less than 100% by virtue of other disabilities. Once the reasoning behind the approach of the combined ratings table is understood, it is clear why simply adding multiple disability ratings in *any* VA context—not simply when calculating VA compensation payments—would likely overstate a veteran's actual disability level and could even result in disability assessments greater than 100%. *Gazelle I*, 27 Vet.App. at 468 & n.9. To the extent that Mr. Moody's proposed method of combining ratings could result in a situation where a veteran is characterized as being 110% disabled, we think that proposal is properly rejected as absurd. *See Mitchell v. Shinseki*, 25 Vet.App. 32, 43 (2011).

Having considered both the relevant text and regulatory context, we conclude that § 4.16(a) clearly requires aggregation based on the combined ratings table to determine whether multiple service-connected disabilities "considered as one disability" meet the 60% or 40% thresholds. The Board's determination that it lacked authority to award schedular TDIU was correct. But given our disposition of the remaining claims, we vacate the TDIU portion of the Board decision and remand that matter for the Board to reconsider it, if warranted, based on any material changes in the ratings

---

[6] VA offers the following example to explain in detail how the combined ratings table works. Suppose Veteran X has a disability rated 60%; VA considers this veteran to be 40% "efficient." To ascertain the additional reduction in efficiency caused by another disability rated, say, at 30%, the starting point is not 100% efficiency (which would connote a non-disabled veteran), but the 40% efficiency Veteran X still has. Proceeding from this 40% efficiency, the effect of an additional 30% disability is to leave only 70% of the efficiency remaining after consideration of the first disability, or 28% efficiency in total. 38 C.F.R. § 4.25. Put another way, the first 60% disability reduces Veteran X's efficiency to 40%. The second 30% disability further reduces Veteran X's 40% efficiency by 70% to a new efficiency of 28% (40% x 70% = 28%). This means Veteran X's combined disability rating is 100% - 28%, or 72%. (VA further specifies that 72% must be rounded down to 70%, *see* 38 C.F.R. § 4.25, but that's really enough math for now.)

assigned to the relevant remanded claims and in light of any pertinent developments regarding the previously remanded extraschedular TDIU issue.

## B. Duty to Assist

The Board declined to order additional medical examinations to determine the current severity of Mr. Moody's back and sciatic nerve disorders and to investigate whether his service-connected disorders caused his depression to develop. He challenges those determinations.

Congress has mandated that the Secretary must "make reasonable efforts to assist" a veteran seeking entitlement to disability benefits. 38 U.S.C. § 5103A(a)(1). Those efforts include "providing a medical examination or obtaining a medical opinion when such an examination or opinion is necessary to make a decision on the claim." 38 U.S.C. § 5103A(d)(1). When determining that the duty to assist has been satisfied, as with any material question of fact or law, the Board has a duty to provide a statement of reasons or bases that allows the claimant to understand the precise bases for the Board's determinations and facilitates judicial review. 38 U.S.C. § 7104(d)(1). As part of this duty, the Board must explain why it rejects relevant evidence favorable to the claimant. *Frost v. Shulkin*, 29 Vet.App. 131, 139 (2017).

### 1. Psychiatric Disorder

An agency adjudicator tasked with determining whether a medical opinion is necessary to decide whether a veteran is entitled to disability benefits must execute a four-step process. *McLendon v. Nicholson*, 20 Vet.App. 79, 81 (2006). Only one of those steps is at issue here. Pursuant to the third step of *McLendon*, a medical examination may be warranted if there is some indication that the claimed disability is linked to service or another service-connected disorder. That is a "low threshold." *Id.* at 83.

The Federal Circuit clarified this standard in *Waters v. Shinseki*, 601 F.3d 1274 (Fed. Cir. 2010). The appellant in that case argued that "his conclusory generalized statement that his service illness caused his present medical problems was enough to entitle him to a medical examination." *Id.* at 1278. The Federal Circuit disagreed. It wrote that

> since all veterans could make such a statement, this theory would eliminate the carefully drafted statutory standards governing the provisions of medical examinations and require the Secretary to provide such examinations as a matter of course in virtually every veteran's disability case. . . . We reject Waters' theory that medical examinations are to be routinely and virtually automatically provided to all veterans in disability cases involving nexus issues.

*Id.* at 1278-79.

The Court reviews the factual determinations prerequisite to *McLendon* under the "clearly erroneous" standard of review. 20 Vet.App. at 83. The Court, however, reviews the conclusion that the Board reaches when it applies those facts to the third step of *McLendon* under the far more deferential "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of review. *Id.*

Citing *Waters*, the Board concluded that there was no reason to obtain a medical opinion addressing whether the appellant's service-connected disorders caused his depression to develop. It based that conclusion on its factual finding that "there is nothing beyond the [appellant's] bare assertion to support a secondary service connection etiology." R. at 24. Mr. Moody challenges this finding. Upon review of the record, the Court concludes that the Board's finding is clearly erroneous.

At a July 2015 Board hearing, Mr. Moody testified that the pain produced by his service-connected disorders causes him to be depressed "because I can't do the things I used to do. . . . I can't, you know, I mean, I want to work. And I can't, I'm not able to." R. at 304-05. His assertion, therefore, is that his service-connected disorders cause him to be unable to work and participate in other activities and that, in turn, causes him to feel depressed. Mr. Moody's assertion that his service-connected back and bilateral sciatic nerve impairment rendered him unemployable is supported by the Board's finding that the record contains competent evidence that the appellant's "service-connected disabilities have rendered him unable to secure and maintain a substantially gainful occupation." R. at 26.

Additionally, there are several pieces of medical evidence that support Mr. Moody's assertion that his depression is linked to his inability to work. For example, an April 2012 medical record indicates that the appellant had "depression and anxiety over unemployment"; a May 2013 medical record states that the appellant sought treatment "due to endorsement of depression and anxiety related to his unemployment"; and a staff physician later wrote that he had "[d]epression and anxiety due to financial stress."[7] R. at 461-63, 602-03, 606, 644-45.

---

[7] Judge Toth's dissent largely is premised on his conclusion that these quotations are nothing more than the appellant's unsupported lay statements recorded in medical records. The Court does not agree with that interpretation. At the very least, the medical records in question indicate that medical professionals endorsed the appellant's description of his disorder. Two of those records reveal that a physician heard Mr. Moody's complaints that the absence of gainful employment caused him to feel depressed, included "[d]epression and anxiety" in her list of objective

In addition to clearly undermining the Board's conclusion that Mr. Moody only made a "bare assertion" that his psychiatric disorder is linked to his service-connected disorders, the evidence cited in the preceding paragraph demonstrates that the Board's determination that there is no indication of a connection between the appellant's depression and at least one service-connected disorder is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The evidence cited above provides medical and legal support for the appellant's theory of entitlement that far exceeds what *Waters* requires. Consequently, the appellant has easily and obviously stepped high enough to cross the low threshold created by the third step of *McLendon*. On remand, the Board should apply the other *McLendon* factors and determine whether a medical opinion is necessary.

### 2. Increased Rating Claims

In determining that it was unnecessary to obtain new VA examinations regarding the increased rating claims for sciatic nerve and back disabilities, the Board's reasons or bases consisted of the following two paragraphs:

> While the veteran has asserted that his service connection back and lower extremity disabilities have worsened since the last examination, the Board notes that an examination to evaluate the lower extremities was conducted quite recently, in 2015, and that report shows symptoms that are no worse than mild.
>
> With respect to the back disorder, the extent of worsening that would be necessary to substantiate a higher rating must be considered. There is no assertion on the veteran's part that he has unfavorable ankylosis of any portion of the thoracolumbar spine.[8] He was provided an additional 60 days to produce evidence that would substantiate his claims of worsening, but he had not submitted or identified evidence that substantiates unfavorable ankylosis of the thoracolumbar spine or such neurological symptoms as would suggest that a new examination is warranted.

assessments, and ordered a "[m]ental health referral . . . for further evaluation and management." R. at 463, 645. Consequently, as it will explain in the following paragraphs, the Court is satisfied that the Board conclusion discerned by Judge Toth that these records are not even speculative medical evidence is clearly wrong and that the record contains far more than a conclusory and generalized lay statement, and the Court certainly thinks that it is within its authority to reach those conclusions.

[8] In the VA disability compensation context,

unfavorable ankyloses is a condition in which . . . the entire spine is fixed in flexion or extension, and the ankyloses results in one or more of the following: difficulty walking . . . ; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia, atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching.

38 C.F.R. § 4.71a, Diagnostic Code 5242 Note (5) (2018).

> The Board concludes that a remand for an examination is not necessary to resolve the rating claims.

R. at 24-25. Because this passage is ambiguous on several key questions of law and fact, the Court is unable to assess whether the Board committed error in finding the duty to assist satisfied.

First, it is unclear whether the Board employed the proper standard for determining whether an examination is warranted in the context of an increased rating claim. Generally speaking, VA must provide a new examination when "the veteran claims a disability is worse than when originally rated, and the available evidence is too old to adequately evaluate the current state of the condition." *Olson v. Principi*, 3 Vet.App. 480, 482 (1992). We have addressed this standard in numerous decisions. *See Palczewski v. Nicholson*, 21 Vet.App. 174, 181-82 (2007) (citing cases). But the Board doesn't mention any of those cases or otherwise clearly articulate the legal criteria it applied when concluding that new examinations weren't necessary. Without clarification, we are unable to review the decision for error.

Similar ambiguity afflicts the second paragraph quoted above. In concluding that a physical evaluation wasn't warranted with respect to Mr. Moody's back disorder, the Board used language that could be read either as (1) a requirement that the current level of disability already meets the criteria for a higher rating before awarding an examination or (2) a finding that the evidence of record here was adequate to decide the higher rating claim without a new examination. Since a VA examination in the higher rating context may often be necessary precisely to determine the current level of the veteran's service-connected disability, *see Proscelle v. Derwinski*, 2 Vet.App. 629, 632 (1992), a Board decision along the lines of the first reading might raise serious legal concerns. Again, the best course of action here is to have the Board clarify its analysis.

Finally, even once the legal standards are clarified, there are outstanding factual matters that require the Board's attention. There is no dispute that Mr. Moody asserted at the July 2015 Board hearing that his sciatic nerve and back disabilities had worsened. What's not clear, however, is the temporal scope of this assertion. Was the veteran alleging only that both conditions had worsened since the VA examinations provided in 2011? The veteran's brief to the Board arguably supports that reading. R. at 276. Or was he further contending that his sciatic nerve impairment had also worsened since the 2015 examination he underwent for that condition six months earlier? That is the interpretation Mr. Moody advances. Appellant's Br. at 27. These are primarily factual ambiguities that the Board, rather than this Court, must resolve in the first instance.

In sum, the portion of the Board decision discussing the duty to assist with regard to the sciatic nerve and back disabilities failed to address salient questions of law and fact, and this omission inhibits effective judicial review. The proper course in these circumstances is to vacate the decision as to the claims and remand for the Board to fill the gaps in its reasons or bases. *See generally Patricio v. Shulkin*, 29 Vet.App. 38, 43-47 (2017). Of course, in readjudicating these claims, the Board is free to determine that new VA examinations are warranted based on the evidence of record or on any additional evidence or argument Mr. Moody presents on remand.

### III. CONCLUSION

The Court denies Mr. Moody's motion for oral argument. After considering the parties' briefs, the record, and the relevant law, the Court concludes that the Board correctly calculated Mr. Moody's disability ratings under § 4.16(a). Nevertheless, the Court VACATES the January 16, 2016, Board decision in full and REMANDS the schedular TDIU issue along with the psychiatric, sciatic nerve, and back claims for additional proceedings consistent with this decision.

PIETSCH, *concurring in part and dissenting in part*: I entirely agree with the outcome that the Court reaches and join all parts of its analysis except for the portion interpreting 38 C.F.R. § 4.16(a). As the Court explained, a veteran is not entitled to TDIU under § 4.16(a) unless he or she meets certain minimum disability rating requirements. The parties debate whether the appellant meets those requirements under the portion of the provision allowing him to consider his service-connected disorders to be "one disability." Depending on the proper interpretation of that clause, he either exceeds the minimum disability rating for a single disability or falls 10% below it.

If the appellant succeeds in gaining entitlement to disability benefits for a psychiatric disorder or increased disability ratings for his other disorders on remand, then he undoubtedly will meet or exceed the § 4.16(a) disability rating requirement no matter which interpretation of the "one disability" clause is correct and become eligible for TDIU under that provision. Since the Board wrote in the remand portion of its decision that the evidence suggests his "service-connected disabilities have rendered him unable to secure and maintain a substantially gainful occupation," I am confident that once he establishes eligibility, he will stand a good chance of completing the steps necessary to obtain entitlement to the benefit that he seeks. R. at 26.

"[W]here a decision on one issue would have a 'significant impact' upon another, and that impact in turn 'could render any review by this Court of the decision [on the other claim] meaningless and a waste of judicial resources,' the two claims are inextricably intertwined." *Henderson v. West*, 12 Vet.App. 11, 20 (1998) (quoting *Harris v. Derwinski*, 1 Vet.App. 180, 183 (1991)) (alteration in original). When issues become inextricably intertwined, the Court should remand them together. It also should avoid opinions that are advisory in nature. *See Quirin v. Shinseki*, 22 Vet.App. 390, 395 (2009). I would summarily remand TDIU and leave the interpretative question discussed by the Court until the appellant has exhausted all opportunities to reach the mandatory disability rating requirements without the aid of the interpretation of the phrase "one disability" that he posits here.

I understand why the Court decided to move forward and address the interpretive issue. The Board decision and the briefs well positioned the Court to consider that issue and the precedent that it creates will be helpful. As far as the parties are concerned, it seems to me a toss-up whether deciding it now or waiting until later will prove to be more time and cost efficient. Furthermore, the appellant decided to go for the home run argument and did not include an "inextricably intertwined" alternative as a backstop. All of those are reasons to issue the decision set forth today. The precedent quoted above, however, instructs me that my resources are best spent by avoiding difficult issues that may become moot when the Board reassesses the case on remand. Consequently, I have reached the same outcome as the Court concerning the appellant's request for schedular TDIU without participating in its analysis.

TOTH, *Judge*, *concurring in part and dissenting in part*:  I join the Court's decision in all respects save for its disposition of the psychiatric claim, from which I respectfully dissent.

Standards of review are important things; like rumble strips, they help keep courts from veering off the road. In *McLendon v. Nicholson*, 20 Vet.App. 79 (2006), we specified the four factors that the Board must address when considering whether VA is obliged to provide an examination or opinion in a claim and articulated the level of review for each. At issue here is the third factor, which inquires whether the evidence "indicates" that a disability or cluster of symptoms "may be associated with service." *Id*. at 83. The Board's factual findings in this context are reviewed for clear error. *Id*. Its determination of whether the evidence indicates a possible association, we've said, is reviewed under the "arbitrary, capricious, an abuse of discretion, or

16

otherwise not in accordance with law" standard. *Id*. at 83 (citing 38 U.S.C. § 7261(a)(3)(A)). Any practical difference between "arbitrary and capricious" review and "clearly erroneous" review is largely "a matter for academic debate." *Burden v. Shinseki*, 25 Vet.App. 178, 187 (1999). The important point is that both standards prevent a court in an administrative appeal from substituting its judgment for that of the agency. *See Elkins v. West*, 12 Vet.App. 209, 216-18 (1999).

But one wouldn't know that from reading the majority opinion, which essentially conducts its own assessment of the record evidence. The majority finds that, based on other evidence of record, the Board clearly erred in determining that only Mr. Moody's assertions suggested a link between depression and service. But what the majority cites are simply medical records recording the veteran's own statements that his depression is related to his service-connected disabilities. As the Board noted, these comments are unaccompanied "by even speculative medical evidence." R. at 24; *cf. McLendon*, 20 Vet.App. at 83 (citing "medical evidence that suggests a nexus but is too equivocal or lacking in specificity to support a decision on the merits" as sufficing under the third factor). I don't see how, as either a matter of law or indisputable fact, we can determine that a conclusory or generalized lay assertion made to a VA adjudicator is any less so when made to a medical practitioner.

The majority admits that *Waters v. Shinseki*, 601 F.3d 1274 (Fed. Cir. 2010), "clarified" the third *McLendon* factor, but it nevertheless concludes that the evidence here "far exceeds" what was presented and deemed insufficient to warrant a VA examination in that case. *Ante* at 13. But this fails to acknowledge the Federal Circuit's very clear assessment of the Board's discretion in such cases: "The Department must consider lay evidence, but may give it whatever weight it concludes the evidence is entitled to." *Waters*, 601 F.3d at 1278. This follows from the court's earlier conclusion that the competence, sufficiency, and probative value of lay evidence are fundamentally factual inquiries that fall within the province of the Board. *Jandreau v. Nicholson*, 492 F.3d 1372, 1377 (Fed. Cir. 2007). The majority seems to think Mr. Moody's lay statements differ in competence, sufficiency, or probative value from Mr. Waters's lay statements. That might be a plausible assessment of the record—but so is the Board's contrary assessment.

We are required to find that the Board's opinion was clearly erroneous, not merely second-best among plausible readings of fact. *See Warren v. McDonald*, 28 Vet.App. 214, 218 (2016). Here, the majority's third-act reevaluation of the evidence fails to recognize that the Board's decision falls squarely in line with *Waters*. Cases "must be decided on the law as we find it, not on

the law as we would devise it." *Mitchell v. McDonald*, 27 Vet.App. 431, 440 (2015). Even assuming that *Waters* and *McLendon* were wrong to give the Board extensive authority to judge (and so discount) the weight of lay evidence in this context, or that the majority's reading of the probative value of Mr. Moody's statements is better than the Board's, none of this allows us to disregard those precedents or to substitute our alternative judgment for the Board's. Because I believe the majority failed to stay in the lane that precedent has marked for us, I respectfully dissent.